UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT - WI
FILED

2026 MAR 27  A 11: 38

CLERK OF COURT

Ryne Jon Schnell

Plaintiff,

v.  Case No. _____  26-C ⁻499

WAUKESHA COUNTY TECHNICAL COLLEGE,

MICHELLE SKINDER,

JONATHAN PEDRAZA,

SAM SAEGER,

BETH SEYBOLD,

GREG PATERAS,

Defendants.

## I. JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges, and immunities secured by the Fourteenth Amendment to the United States Constitution.

2. This Court has further jurisdiction under 42 U.S.C. § 12132 (Title II of the Americans with Disabilities Act) to address discrimination and deliberate indifference by a public entity.

1

3. Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b) because the Defendants reside in this district and the events giving rise to the claim occurred in Waukesha County.

## II. PARTIES

Plaintiff Ryne Jon Schnell is a resident of Waukesha County, Wisconsin, a student at WCTC, permanently disabled and is living with the residual effects from a documented, severe Traumatic Brain Injury (TBI), including Glasgow Coma Scale rating of 3, the lowest possible, followed by a prolonged coma.

Defendant WAUKESHA COUNTY TECHNICAL COLLEGE (WCTC) is a public educational institution receiving federal funds.

Defendant MICHELLE SKINDER, VP of HR/Legal, is sued in her individual and official capacity for her role in denying forensic evidence and excluding Plaintiff's legal guardian.

Defendant JONATHAN PEDRAZA, Dean of Students, is sued in his individual and official capacity for the retaliatory summary suspension of Plaintiff on February 20, 2026.

Defendant SAM SAEGER, Hearing Officer, is sued in her individual and official capacity for her refusal to empanel an objective, unbiased disciplinary board in violation of the 14th Amendment.

2

Defendant BETH SEYBOLD, Student Life Staff, is sued in her individual and official capacity for the initial discriminatory hostility and harassment directed at Plaintiff regarding his disability.

Defendant GREG PATERAS, Student Life Administrator, is sued in his individual and official capacity for his failure to intervene and his participation in the "Hostile Environment" under the ADA.

## III. PRELIMINARY STATEMENT AND LEGAL FRAMEWORK

**A. The "Dear Colleague" Era and the Subversion of Rights** Plaintiff brings this action to challenge the unconstitutional, low standard of proof utilized by the College to deprive him of his fundamental right to an education. This systemic failure dates back to the Clinton Administration (1995–1997), where the Office for Civil Rights (OCR)—an administrative agency under the Department of Health & Human Services (DHS) and the Department of Education (DOE)—first formally required the "Preponderance of the Evidence" standard.

The OCR exists to enforce federal laws prohibiting discrimination, yet through the 2011 "Dear Colleague" letter, it used falsehoods and appeals to emotion to subvert student rights. Under the guise of addressing "sexual assault," the OCR mandated a 50% + 1 "more likely than not" standard. By 2011, nearly 70% of colleges had applied this dangerously low bar to **all** student misconduct, not just the original categories. The DOE's justification—that these proceedings are "civil" or "administrative"—is a legal fiction. When a student is accused of "unauthorized access" or "impersonation," these are **criminal allegations**. WCTC is using "stolen valor" by alleging criminal acts while denying the accused the "Beyond a Reasonable Doubt" standard that the Constitution requires for such serious charges.

3

**B. The Impact of *Loper Bright* and the End of *Chevron* Deference** The historical tradition of the United States was restored in **Loper Bright v. Raimondo (2024)**. For 40 years, *Chevron* deference allowed agencies like the DOE to interpret vague laws however they saw fit, essentially changing the law based on the current administration.

The Supreme Court has now ruled that this handed too much power to the executive branch. Citing the Administrative Procedure Act of 1946, the Court affirmed that **Judges, not bureaucrats, decide what a law means.** This means WCTC can no longer rely on outdated "Guidance" from the OCR to justify stripping a student of their rights. This Court must look at the text and historical context of the 14th Amendment, rather than letting a technical college administrator update it for "modern needs."

**C. *SEC v. Jarkesy* and the Right to a Jury for "Private Rights"** In SEC v. Jarkesy (2024), the Supreme Court addressed the government's attempt to bypass jury trials by hauling people into "administrative courts" inside their own agencies. The Court ruled that if the government wants to hit you with penalties for something that looks like a traditional "common law" crime (like the fraud in *Jarkesy* or the "impersonation" and "hacking" alleged here), they **cannot** use an internal agency hearing. They must provide the protections of a real court. The allegations against Plaintiff are not merely "administrative issues"; they are serious accusations that require the substantive process of a court of law.

**D. The *Goss v. Lopez* Standard and Defendant Pedraza's Defiance** Goss v. Lopez (1975) established that public school students are entitled to procedural due process under the 14th Amendment. At a minimum, this requires notice, an explanation of evidence, and an opportunity to be heard.

In a recorded conversation, Defendant **Jonathan Pedraza** was made fully aware of *Goss v. Lopez*, yet his response was that his interpretation of WCTC's student code **supersedes established Supreme**

**Court judgment.** Furthermore, on February 20, 2026, Mr. Pedraza stated multiple times: *"I am not an agent of the state."* WCTC is a public institution. If Mr. Pedraza is not a state actor, he has no legal authority to suspend a student. By denying his status, he attempts to bypass the very due process he is required to provide.

Finally, the College's sudden addition of a "danger" claim in their second email—absent from the first email and the original certified mail—is a transparent and bad-faith attempt to "retro-fit" their actions to meet the *Goss* exception for immediate danger after the Plaintiff notified them of *Goss*. This is a willful and knowing defiance of the law, mirroring the personal liability found in **Barnes v. Zaccari**, where a university president was held liable for a "summary suspension" that failed to meet the "immediate danger" threshold.

## IV. STATEMENT OF FACTS

Some of these dates can't be made exact. WCTC has denied me entry to campus undert threat of criminal trespass prosecution, has "temporarily" suspended me, for over 30 days and has locked me out of my student account and thus my email, which has some of these questions / commentary and replies within them.

**1)**

Prior to or during the first week of the Fall 2025 semester, Plaintiff visited **Ollie's Compass** (WCTC's general office for the Registrar, Bursar and student point of contact for help and assistance).

5

At Ollie's Compass I signed a release of information designating his parents as his advocates and guardians for all academic and disciplinary matters, and granting the school a release to my parents for all records.

At that same time, Plaintiff formally informed the College, through the Student Accessibility Office (SAO) of his Traumatic Brain Injury (TBI) and need for accomodations in his upcoming classes. Plaintiff met with a Lauren Harmon of the SAO to set these accomdations up.

These filings established the College's "Actual Notice" of Plaintiff's disability and his required support structure. Consequently, any subsequent actions by the College to bypass Plaintiff's advocates or fail to provide accommodations were not the result of ignorance, but were willful violations of the established support plan.

**2)**

On or about August 12 2025, as a new student to WCTC I was curious how the cost is calculated and paid. So I go into the student account and find the "PAY ..." link, follow it and see a GIANT list of charges added and removed from my account. This confuses me greatly, it makes little if any sense and does not state clearly "mm/dd/yyyy Fee for Class Identifier" "mm/dd/yyyy Fee for Class Identifier" ... etc. It has random, sporadic, and non-descriptive, completely vague entries.

This doesn't sit well with me so I email my advisor, Beth Seybold. I email her this entire list and ask what each entry means, where each came from and for what each exists for. She just brushes it off "Talk to the bursar in Ollie's Compass (I think, I have no access to the email to see)..." I get frustrated by the way she's unwilling to help, but I follow her instruction and go to the bursar (again: I think that's the name used) as soon as I can. I ask about these nonsensical charges. I get a similar unhelpful

6

response "Well due to state law that's how class charges are broken up" (That is not a direct quote, that is a paraphrased recollection of the conversation with the 'bursar's' office in Ollie's Compass). This is not one bit helpful.

## 3) On October 21, 2025

During the Fall Term, Plaintiff attended a course instructed by Patrick Gerber. Upon entering the classroom and sitting in the front row, Mr. Gerber addressed Plaintiff with the singular, cryptic word: **"Brave."** During the lecture, Mr. Gerber inexplicably discussed the Wisconsin CCAP (Circuit Court Access) system, claiming there was an entry under his name that was "not him."

At the conclusion of the class, a separate instructor, Bill Barkhaus, accosted Plaintiff. Mr. Barkhaus blocked the only exit of the seating aisle, leering at Plaintiff and making disparaging remarks about Plaintiff's personal history, stating he "knew what [Plaintiff] did." This encounter created an intense sense of fear and apprehension.

Plaintiff subsequently met with Greg Pateras and Samantha Saeger to report this targeted harassment. While they stated they would "handle it," they refused to confirm if any disciplinary action was taken. This incident stands in direct violation of the WCTC Code of Conduct, which strictly prohibits discrimination based on an individual's record or convictions. This event established a **pre-existing hostile environment** and suggests that Plaintiff was being targeted by faculty long before the February 2026 suspension.

## 4)

Soon after the above, so within a week after August 12, 2025, I go talk to my father about this, show him my "PAY ..." link and the charges, he goes over them, isn't sure about them either but the amount is within what the cost of classes are, so he pays and that's done.

7

**5)**

On or about the week of (starting on) January 4th 2026 - I email the course instructor for Introduction to Java (programming) and inquire about the course requirements. She tells me I would be required to sign up for Microsoft's github to participate in the course and it's homework. I have no interest in being forced to sign up for a 3rd party website where my data is harvested and monetized - Microsoft and Github have come under heavy scrutiny and criticism due to this - and understand the school can't force that, but does anyway.

**6)**

On or about the week of (starting on) January 4th 2026, I file a complaint within the school to question this requirement that the school is forcing students to sign up for 3rd party contracts to do homework and submit their copyright, code to. I look up FERPA and notice this falls well outside of the law, requiring not only my ability to not consent to sharing my PII (Personally Identifiable Information) with Microsoft's Github - 34 CFR § 99.30(a), an educational agency or institution must obtain prior written consent from a student before it discloses PII from the student's education records, except as provided in § 99.31. - where the 99.31 exception allows sharing of PII only if the contractor is under the **"direct control"** of the school regarding the use and maintenance of education records. WCTC's requirement that students enter into private contracts with Microsoft/GitHub to complete coursework constitutes an unauthorized disclosure of Personally Identifiable Information (PII) under 34 CFR § 99.30.

The College cannot claim the 'School Official' exception under 34 CFR § 99.31(a)(1)(i) because it lacks 'direct control' over the maintenance and use of the records. Specifically, Microsoft/GitHub requires students to assent to independent Terms of Service and Privacy Policies that grant the

8

corporation rights to student data—including IP addresses, metadata, and copyrighted code—that fall outside the scope of the College's FERPA obligations.

Because WCTC cannot audit, control, or prevent Microsoft's secondary use of this PII, the 'direct control' requirement is technically and legally impossible to satisfy. Therefore, the mandatory disclosure of PII to a third-party commercial entity without prior, non-coerced written consent is a facial violation of FERPA.

7)

On or about the week of (starting on) January 11th 2026 - I walked to the Student Life Center, noticed Beth Seybold was staffed at the desk. I began talking to her about wanting to take a course: Introduction to C# Programming, which was scheduled Monday and Wednesday at 9am to 11:50am, but I also want to schedule Cisco 2: Switching, Routing and Wireless Essentials which is on Monday from 8am - approximately 11:50am. There's a collision in times here. I've already gotten the okay from the Intro to C# teacher (Patrick Gerber) to only show up on one of two classes per week, he's seen my programming ability and is fully aware that I won't need both days of instruction to complete the course to well above requirements.

Beth gets angry when I call her attempts to claim that the school has some worry about "We can't keep track of you if you're not there, what if a school shooting happens, headcount would miss you!" Where the issue I raised is that the courses at WCTC are often online during the course and/or allow for makeups with recorded video per teacher's use of and uploading recorded video. The headcount argument is less than specious, head count would miss me if I just didn't show up, if I had an excused absence, or was an online student.

She then stood up in anger and escorts me to Greg Pateras' office for me to talk with him about this. I end up dropping both Cisco 2: Switching, Routing and Wireless Essentials and Introduction to Java because both require 3rd party contracts to be signed, which I am extremely uncomfortable with.

9

**8)**

On or about the end of the week of (starting on) January 11th 2026, I run into Greg Pateras of Student life on the way to the Hub (student food court) and flag him down, I talk to him about my being uncomfortable with regard to the numerous requirements and technologies the school uses that are completely corporate based and not necessarily private.

**9)**

My only course for Spring 2026 term 1 ends up being Introduction to C# Programming. On or about the first week of classes for Spring 2026 term 1, which started on January 19, 2026, I learn that the C# curriculum is a corporate based curriculum and uses a website (codio) https://www.codio.com/ to do a large portion of the homework. I'm uncomfortable with this but have already signed up. I email the teacher (Patrick Gerber), express my feelings and he states that he's okay with me doing a separate project and not signing up to complete the codio work. His request is two parts, first he has to ask the dean of the Information Technology school, Alli Jerger if it's okay for me to do a separate project in replacement. She okays this. The next is for me to write a proposal on what I'd like to do and a set of basic requirements for this project. I write this up, the teacher accepts. On or about week 4 I show him my progress and his words "That's more than enough.", indicating that I've already completed my separate project, that fulfilled the homework requirements normally set with the codio website.

**10)**

I receive an email from a Dr. Lango, the Associate Vice Provost at WCTC informing me that the school investigated itself, and found no wrongdoing. My claim from number 6 above gets denied. So I think a bit, I've exhausted options within the school, so I go to email the WCTC board of trustees through

Jennifer Hagen (who is listed as the Board's public contact on the WCTC website) on Jan. 27, 2026 and inquire about the board and how to add items to the agenda about this violation of FERPA. I receive no response.

## 11) February 6, 2026

So, after I email / file a complaint with WTCS (Wisconsin Technical College System), I mention two separate things: 1 - the issue I have stemming from the FERPA issues explained above, and 2 - the schools description of courses not telling students of these requirements to sign third party proprietary contracts. I receive a reply email from a Christina Lorge. I have numerous of these emails saved on my private email account as I decided to CC myself, my mother and my father in these communications. I did so specifically for fear of retaliation from the school.

The end of it is that WTCS agrees with me on the second of my two complaints that I raised to them. The response email from Christina Lorge of WTCS:

> "The concern you raised regarding the requirement to use Microsoft/GitHub for your Introduction to Java course could fall under Wisconsin consumer protection laws. Our review indicated that the use of this platform is standard practice for this course, and comparable WTCS courses reflect the same requirement."

> "WTCS met with Waukesha County Technical College (WCTC) and recommended that course materials include clearer disclosures that some courses may require the creation of accounts or memberships on third-party platforms or software. WCTC is currently working to implement this update."

> "We also reviewed whether this practice constituted a violation of FERPA and did not find that it did."

11

I disagree with 1 and 3. This email was received by me, from Christina Lorge on Feb. 6, 2026 at 8:21 AM.

**12) February 9, 2026**

I reply to Christian Lorge acknowledging the validation of one of my two points and challenge the denial of my second point. I ask;

> "Thank you for confirming that WTCS has found WCTC's course disclosures to be insufficient and has mandated updates to their catalog. This validates the Consumer Protection portion of my complaint.
>
> However, I find the determination regarding FERPA to be legally irreconcilable with federal requirements. Under 34 CFR § 99.31(a)(1)(i)(B), a school may only disclose Personally Identifiable Information—including metadata, IP addresses, and hardware fingerprints—to a third-party service provider without consent if that provider is under the "direct control" of the agency."

> ... (Plaintiff has the full email)

I get no reply that I've seen, because my email and entire student account is locked from my access. Defendants have intentionally locked me out of my student email account, effectively 'sequestering' evidence and preventing me from accessing the specific dates and times of communications necessary for my defense, further violating my Due Process rights.

**13) February 19–20, 2026**

12

On February 19, 2026, I emailed Jennifer Hagen of the WCTC Board of Trustees to inquire about adding an item to the board agenda and obtaining minutes to speak. I do not currently have a copy of this email as I am locked out of my student account and did not carbon copy (CC) my personal address. On Feb. 20th at 3:08 PM I receive a call from Dean Jonathan Pedraza who explains that I am being suspended. I was shocked by this news. The only thing that sates me is that I've been concerned this type of retaliation would happen and had remembered to CC myself, my mother and my father for quite a few of the email interactions I've had while filing my complaints. A brain-damaged, permanently disabled (TBI) student taking 3 classes and getting a 100% in each of them, doing the same in his current, 4th course, and raising questions, filing complaints the slow and correct way, and asking questions. This apparently is something the school does not like.

The letter which Dean Pedraza never goes into, despite my inquiry, arrives not immediately after the call as he stated it would multiple times, but arrives over 90 minutes later, at 4:41 PM on Friday evening. The email has an attachment, "the letter", which lists 5 different, but not limited to, alleged violations: "Generating Harmful or Malicious Content", "Misinformation and Deception", "Unauthorized Software Code/ Removal of Software", "Interference with College IT Systems", and "Unauthorized Access to or Use of IT Resources". Which to me, at this point in time is still shocking, Dean Pedraza was of no help explaining the situation, he refused to answer questions, rather spent time dodging question during the phone call and subsequent calls.

This attached letter states we are to reply, by phone or email, to Ilmara Steffan no later than Feb. 25, 2026.


**14) February 23**

On February 23, 2026, my parents and I drafted a formal response to Dean Pedraza's February 20th letter. At 1:05 PM, the response was sent from my mother's email account to Ilmara Steffan and

13

Case 2:26-cv-00499-JPS    Filed 03/27/26    Page 13 of 33    Document 1

Jonathan Pedraza, with carbon copies (CC) to my father and myself. The email was clearly identified as being sent on my behalf by my mother and father in their capacity as my legal guardians, with my involvement.

The College is well-informed and has been provided with all necessary releases regarding my parents' role in my communications. In this correspondence, I requested nine specific pieces of evidence, including technical logs and data essential to addressing the allegations levied against me (the nine items are detailed below in Paragraph 27). No response was received from Ms. Steffan or Dean Pedraza for the remainder of the business day.

### 15) February 24

In the early afternoon, I receive a call (my phone call log says 1:24 PM) from an Officer Lenius who is the WCTC Police Liaison officer from the Village of Pewaukee Police Department. I was incredibly uncomfortable on the call, not only does he assert as a matter of fact "I'm a reasonable guy, everyone would say this...", he also makes an inappropriate joke when the conversation moves to me being uncomfortable with the conversation and me stating that I just need to change and head over to my parent's house and he can call me back in a short time, 30 minutes or so, I forget exactly. He makes his joke "Well now I'm uncomfortable, you're talking about taking your clothes off!", which floors me. I manage to end the call and head over to my parents house.

### 16) February 24th

On my way out of my condo. I check my mail and I receive notice that I missed a certified mail that was attempted to be delivered on Feb. 23rd. On the way to my parents I picked it up. This version of

14

"the letter" is identical to the email from Feb. 20. Notably, the letter contained no language indicating that I posed an immediate "danger" or "threat" to the campus community—a standard typically required to justify an emergency suspension and the subsequent threat of criminal trespass charges.

## 17) February 24th

At 2:29 PM, while at my parents' house, we received a return call from Officer Lenius. I have a full recording of this call (12 minutes, 51 seconds). My father inquired about the suspension and cited *Goss v. Lopez*, but Officer Lenius was evasive with specifics. During this call my father set up an additional call with Jonathan Pedraza. This call is recorded (the call with Officer Lenius at Plaintiff's parent's house).

At 3:40 PM, we had a call with Dean Pedraza (which I have partially recorded, the first 2 or so minutes were missed, the remaining 9 minutes and 25 seconds are recorded). During this call, my father asked, "Do you think your student code paper supersedes Supreme Court precedent?" After a moment of thought, Dean Pedraza answered, "Yes."

> Of note: the letter received as an attachment in an email received on Feb. 20th contains no "danger" language that would allow for the school to ignore Goss and proceed with a suspension, as Goss allows in certain and specific situations.

Dean Pedraza remained tight-lipped about the details of the suspension, though we gleaned a small mention of "API manipulation." He was again made aware of *Goss v. Lopez* and explicitly stated that WCTC's actions supersede that case.

During this call Plaintiff's father sets up an appointment for a meeting on Wed. Feb. 25th to meet to resolve the suspension and for me to gain some insight on what Plaintiff is actually alleged to have done. None of the communications so far have even hinted at a specific act.

15

At 4:40 PM—exactly one hour after the call—I received an email from Dean Pedraza containing a second copy of the suspension letter. While the first two copies of the letter (received Feb. 20 by email and Feb. 23/24 by certified mail) were identical, this third copy, received by email on Feb. 24, was edited to include "danger" language, added four days after the initial suspension. I have preserved all three versions of the letter and the recordings of these phone calls.

**18) February 25**

My parents and I attended a meeting with Dean Jonathan Pedraza and Gregory Pateras. I have an audio recording of this meeting (48 minutes, 50 seconds). During this meeting, we gained very little information regarding the specific allegations. Dean Pedraza showed my parents a single piece of paper for a brief moment but stated they were not allowed to keep it. When my father inquired why our February 23rd email remained unaddressed, Dean Pedraza acknowledged receiving it but provided no substantive or meaningful explanation for the lack of response.

During the meeting, Dean Pedraza finally informed me that the allegation involved me "opening a ticket" and impersonating a staff member, Beth Seybold. I denied any recollection of such a ticket, stating, "It sounds like something I could say, but I do not remember it" (approximate recollection). I informed Dean Pedraza that I had only ever opened two tickets with the school: one requesting assistance to change my password, and one regarding the use of "rclone" (an industry-standard technology) with my school-provided Microsoft OneDrive account. I noted that the school blocks "rclone" for unknown reasons. I maintained that these were the only two tickets I had ever opened with WCTC.

**19) February 27**

At 3:42 PM, I received a call from Dean Pedraza (recorded; 8 minutes, 16 seconds) informing me that I would be receiving a follow-up email regarding my enrollment. At 4:11 PM, I received that email, titled "WCTC Follow-up," which contained a document titled "CONDUCT AGREEMENT AND CONDITIONS OF CONTINUED ENROLLMENT."

This document was essentially a "no-contest plea" form. It required me to agree that the College had "proven" its case against me, even though the College had still not provided specific evidence or even a clear description of the alleged misconduct. The agreement included a "mark" on my permanent record and various assertions of fault.

I found this agreement entirely unacceptable. Given that the College had already demonstrated a pattern of modifying official documents (the suspension letters) and locking me out of my student accounts, I could not, in good conscience, sign a document that validated unproven allegations and permanently stained my academic record. I refused to accept any outcome that suggested I had committed a wrong which had not been forensically or procedurally proven.

## 20) March 3

On or about Tuesday, March 3, 2026, my parents retained legal counsel, Attorney Paul Bucher. Simultaneously, my father petitioned the Waukesha County Circuit Court for a Temporary Restraining Order (TRO) and Injunction against WCTC, with a hearing scheduled for March 10, 2026.

## 21) March 10

At approximately 9:30 AM, a hearing for a Temporary Restraining Order (TRO) was held in Waukesha County Circuit Court. During the proceedings, Plaintiff felt marginalized and sidelined; his then-counsel, Attorney Bucher, had failed to engage in substantive communication prior to the hearing and

17

spent a significant amount of time conferring with the opposing parties—Dean Pedraza and WCTC's legal counsel. Plaintiff was suddenly informed, without prior consultation, that the request for the TRO and Injunction was being dropped due to "improper venue."

A mere few hours after this sudden dismissal, at 2:23 PM, Plaintiff received an unprecedented email from Jennifer Hagen, the WCTC Board of Trustees contact. Despite the College previously obstructing Plaintiff's communication, Ms. Hagen proactively reached out to inform Plaintiff that he would be forbidden from addressing the Board at the meeting that same evening regarding the use of third-party platforms and FERPA violation on campus.

This email, coming immediately after the failed court hearing, appeared to be a coordinated effort to "gloat" and ensure Plaintiff was silenced in every possible forum—both judicial and administrative. This orchestrated dismissal and subsequent bar from public comment necessitated the present Federal Civil Rights filing to seek the protections denied in state court.

## 22) March 11

Attorney Bucher withdrew from my case following an email I sent him the evening of March 10th. In that communication, I expressed extreme frustration and "questioned" his methods, specifically his apparent failure to review the extensive documentation I had provided and his failure to coordinate with the Foundation for Individual Rights and Expression (FIRE). I had previously secured a lead with FIRE, who indicated they would be willing to supplement my legal efforts if my attorney contacted them directly. Because my counsel failed to act on this, I effectively lost the support of a major civil rights organization. My pointed communication was a direct result of feeling "unheard" and "ignored" by my own counsel during a high-stakes constitutional crisis, while navigating the cognitive challenges of a TBI. Following this withdrawal, I have been forced to proceed Pro Se.

**23) March 12**

Proceeding Pro Se, I filed a formal complaint with the Department of Education's Office for Civil Rights (OCR). I also submitted a certified, successfully delivered "Consent for Release of Information," which is a prerequisite for such investigations. As of this filing, nearly two weeks have passed without any contact or acknowledgment from the OCR.

On the same day, Plaintiff received an email from Samantha Saeger containing a link to a "maxient.com" domain, stating: *"A letter has been issued to you electronically by our office."* This was a sudden and suspicious departure from the College's established protocol; all previous formal notices had been sent as direct email attachments. This change in delivery method added an unnecessary layer of technical complexity and raised concerns regarding the security and tracking of my student data.

**24) March 13**

At 10:07 AM, Plaintiff received an email from Samantha Saeger. This communication reverted to the College's previous protocol of including an email attachment rather than a third-party link. The attached letter—the same document shared via the "maxient.com" link the previous day—detailed a scheduled hearing date and the specific procedural rules established by the College for the proceeding. The hearing was scheduled for March 23, 2026, at 2:30 PM.

**25) March 13**

Plaintiff replied to Samantha Saeger's email (CC'ing Dean Pedraza, Jennifer Hagen (the WCTC Board of Trustees contact), and Plaintiff's parents) informing the College of the active OCR investigation. In this communication, Plaintiff formally requested the following:

- **ADA Accommodations for Effective Communication:** Specifically, the provision of technical logs in a direct, accessible format.

19

- **Restoration of Student Email Access:** To allow Plaintiff to review academic and communication records necessary for a defense.

Additionally, Plaintiff reminded Ms. Saeger—who was part of the Student Life team involved in the matter in October 2025—of a prior incident on October 21, 2025, in which an instructor's actions caused Plaintiff to experience a significant sense of fear and apprehension. This notification served to highlight the ongoing hostile environment and the College's prior knowledge of safety concerns.

## 26) March 16

At 11:26 AM, Plaintiff received an email from Samantha Saeger stating that WCTC was *"reviewing [Plaintiff's] request for information and will be providing a response to it this week."* Ms. Saeger further stated:

- *"WCTC will also be providing for exchange with you the exhibits it may use at the conduct hearing."*

- *"If you feel you require any accommodations to participate in the process, I have let you know the process for making that request in the letter."*

- *"Please identify the emails you believe that you need in order to participate in the hearing, and we can work with you to provide copies as appropriate."*

While this email appeared to offer cooperation, it placed the burden on Plaintiff to "identify" specific emails while Plaintiff remained locked out of the very account needed to identify them. Furthermore, it ignored Plaintiff's previous specific request for the technical logs in an accessible format as an ADA accommodation for Effective Communication.

**27) March 16**

At 7:48 PM, Plaintiff sent a formal response to Samantha Saeger, Dean Pedraza, and Ilmara Steffan, with copies to Jennifer Hagen (the WCTC Board of Trustees contact) and Plaintiff's parents. In this communication, Plaintiff reiterated the formal request for the nine specific categories of forensic evidence first requested on February 23, 2026. Plaintiff clarified that these logs were necessary to satisfy the ADA requirement for **Effective Communication** and to provide a meaningful defense against the College's technical allegations. The requested items included:

1. **HTTP/S Request & Response Logs:** Full verbose logs including Request Methods (GET, POST, PUT, DELETE), specific URI/Endpoints accessed, and resulting HTTP Status Codes.

2. **Request Headers & Metadata:** Full header information, specifically User-Agent strings, Referrer headers, and any custom X-Headers associated with the session.

3. **IP & Connection Data:** Source and Destination IP addresses, and specific Source/Destination Ports (e.g., Port 443).

4. **Hardware Identification:** Network interface IDs and MAC addresses for every network device associated with the alleged incidents.

5. **Authentication & Authorization Logs:** OAuth2 tokens, session IDs, and specific API keys/tokens used to link an account with session ownership.

21

6. **Server-Side Environmental Data:** Specific server hostnames, OS versions, and patch levels (e.g., Ubuntu 22.04.3 LTS) of the systems allegedly "interfered" with.

7. **Application Logs:** Raw .json or .xml payloads sent to the Canvas API and the corresponding system responses.

8. **Network Layer Logs:** Available PCAP (Packet Capture) data or NetFlow records showing the volume and frequency of the alleged "interference."

9. **Impersonation "Proof":** Specific form-entry logs, database entries, or email headers showing the precise timestamp and method by which a staff email address was allegedly used for impersonation.

In this communication, Plaintiff also requested a postponement of the March 23rd hearing, as the College had still failed to provide either a specific description of the allegations or any of the accessible forensic evidence required for a defense.

**28) March 19**

At 12:17 PM, Plaintiff received a reply from Samantha Saeger stating, *"Please see the attached letter with my responses to your requests."* In this correspondence, the College agreed to reschedule the hearing, stating they were *"in the process of identifying alternative hearing dates"* and would provide an amended notice.

Furthermore, the College formally recognized Plaintiff's TBI by granting an ADA accommodation of "time-and-a-half" for timed responses during the hearing. However, this same communication stated that while the College was *"reviewing"* the request for forensic evidence and data preservation, it was **unwilling to restore Plaintiff's access to his student email account.** > This created a paradoxical and discriminatory situation: the College acknowledged Plaintiff's disability and the need for

Case 2:26-cv-00499-JPS    Filed 03/27/26    Page 22 of 33    Document 1

accommodations, yet continued to withhold the very digital records and email access necessary for Plaintiff to utilize those accommodations or prepare a meaningful defense.

## 29) March 20

At 8:54 AM, Plaintiff received an email from **Michelle Skinder**, Vice President of Human Resources and Legal Affairs. Regarding the nine forensic items requested by Plaintiff on February 23rd, Ms. Skinder stated: *"The College does not have any records responsive to Requests 1-2 and 4-8."* > This admission was shocking. These requests (Items 1, 2, 4–8) cover the foundational technical logs—such as HTTP request/response data and server-side logs—that are strictly necessary to prove any allegation of "API manipulation" or "unauthorized access," even under a "preponderance of the evidence" (50% + 1) standard.

Ms. Skinder further directed Plaintiff to a "Quarles ShareFile" link (a third-party legal document service) to download records purportedly responsive to Requests 3 and 9. Ms. Skinder's formal admission that the College lacks the primary technical logs renders the charges against Plaintiff factually impossible. This confirms that the interim suspension was not based on forensic evidence, but was instead an act of malicious intent and retaliation.

## 30) March 20

At 12:44 PM, Plaintiff replied to Ms. Skinder's email, challenging the College's assertion that it lacked the foundational technical logs (Items 1, 2, 4-8). Plaintiff stated: *"If the College 'does not have records'... please confirm that the College intends to drop all charges, as it is impossible to prove 'unauthorized access', 'manipulation', 'impersonation', or 'interference' without the very technical logs you claim do not exist."*

In this same communication, Plaintiff formally demanded the immediate preservation of the January 21, 2026, Library Security footage. This footage is relevant to an incident where an IT Help Desk employee acted in a highly irregular manner while Plaintiff was performing a mandatory password change. Plaintiff explicitly warned the College: *"Any failure to preserve this footage... will be noted as spoliation of evidence in my active federal OCR investigation."*

Finally, Plaintiff objected to the use of the "Quarles ShareFile" link, citing digital privacy and security concerns regarding submitting personal data to third-party forms for documents that could be provided as direct email attachments. Plaintiff requested that all further disclosures be provided as direct attachments.

### 31) March 20

At 10:45 AM, Plaintiff received an email from Samantha Saeger providing an "Amended Notice of Hearing." The College officially rescheduled the conduct hearing for **April 1, 2026, at 1:30 PM**. This notice was issued despite Plaintiff's outstanding requests for forensic evidence and the College's prior admission that it lacked the foundational logs necessary to support the charges.

### 32) March 20

At 1:03 PM, Plaintiff replied to Samantha Saeger, notifying her that the College had still failed to provide accessible discovery files in a non-proprietary format via direct email attachment. Plaintiff posed the same foundational question to Ms. Saeger that had been sent to Ms. Skinder: *"Which begs the question, then, how is WCTC alleging anything against me if they don't even have evidence of the allegations being levied?"* > Plaintiff explicitly informed Ms. Saeger that he could not confirm participation in the April 1st hearing until the requested evidence was provided in an accessible format.

This communication served as a formal objection to the hearing proceeding without the "Effective Communication" and "Notice of Evidence" required by the ADA and the Fourteenth Amendment.

**33) March 24**

At 1:52 PM, Plaintiff received an email from Michelle Skinder stating that the College had no records responsive to the request for Library security footage. In her denial, Ms. Skinder cited a date from the previous year (**January 21, 2025**) rather than the relevant date of **January 21, 2026**, as explicitly requested by Plaintiff.

This error reflects a reckless disregard for the facts of the case and a failure to perform the "due diligence" required under the ADA, the Fourteenth Amendment, and Wisconsin Open Records Law. By providing a denial based on a non-existent request for 2025, the College effectively obstructed Plaintiff's ability to secure evidence of staff intimidation, further contributing to a **Hostile Environment** and the systemic deprivation of Plaintiff's right to a meaningful defense.

**34) March 24**

At 3:36 PM, Plaintiff replied to Michelle Skinder, explicitly correcting her "year error" and providing formal notice that the College has a legal obligation to preserve and provide the records from **January 21, 2026.**

Plaintiff further informed Ms. Skinder that any continued failure to preserve or produce this footage— particularly given that the request fell well within the standard 60-day retention window—constitutes **Spoliation of Evidence.** Plaintiff clarified that this failure appeared intended to obstruct Plaintiff's

25

defense in the upcoming April 1, 2026, hearing and would be noted as such in all subsequent legal and administrative proceedings.

**35) March 24**

At 7:53 PM, Plaintiff received an email from Michelle Skinder. She finally sends him via email attachments SOME of the requested evidence. There are 8 files of various formats and logs;

'Exhibit A-incidentINC0115670.pdf'

'Exhibit B-CanvasErrorReport.pdf'

'Exhibit C-RS Canvas Sign in Activity 02.18.2026.pdf'

'Exhibit D-RS Canvas Sign in Activity-Location 02.18.2026-1.pdf'

'Exhibit E.1-RS Authentication History 01.21.2026-02.20.2026.xlsx'

'Exhibit E.2-RS Authentication History 01.21.2026-02.20.2026.xlsx'

'Exhibit F-Email of Investigation into Ticket INC0115670.pdf'

'Fw_ Upset Student and Interaction with a teacher or other student.eml'

But this is still not including the file with access to my emails from my email account. However, Michelle did offer two alternatives:

1 - I can either mail you a flash drive containing the emails

2 - or make them available via ShareFile, and change the default settings so you don't need to enter any name or email to access the ShareFile folder.

Additionally this email attempts to gloss over the fact that the School has not preserved a security camera recording about an event I informed Dean Pedraza about in the February 25th meeting - footage from January 21, 2026.

Michelle Skinder's email above admits that the College is proceeding with a high-level disciplinary hearing while missing 7 out of 9 industry-standard technical logs and 100% of the relevant security

26

footage. Furthermore, the documents provided (specifically Exhibit A and B) identify the reporter of the incident as "guest guest" and "Unknown User." As a technical expert, Plaintiff notes that it is architecturally impossible for a 2FA-authenticated student session to generate a "Guest" ticket. This confirms that WCTC is relying on a single, uncorroborated IP address—which identifies a router, not a person—to justify a retaliatory suspension. A suspension that was supposed to be temporary, is now (March 24th) on day 33.

WCTC claims their system is secure. If it is secure, an authenticated student (me) cannot be a 'Guest.' If it is not secure, then anyone could have sent that report.

**36) March 25**

At 6:48 AM Plaintiff received an email from Samantha Saeger. In this email Samantha informed the Plaintiff of the following:

> "You have indicated that the College has withheld 7 of 9 categories of requested logs, preventing you from preparing for the rescheduled conduct hearing. To be clear, the College has not withheld this information. It does not maintain the records you have requested and therefore cannot provide them to you."

Samantha is admitting in this email that the college 'does not maintain' the 7 categories of technical logs requested by me. Therefore, the college has formally admitted they have zero proof linking my computer to this "Guest" ticket. They are attempting to expel a student based on a "router match" while admitting they lack the technical capacity to verify the actual device. This along with their own shared evidence showing that this ticket was generated by a "guest guest" user account, and not my authenticated, as required by WCTC, rschnell2@my.wctc.edu student identity.

Federal courts have consistently ruled that an IP address identifies a router, not a person (***United States v. Harris, 2016***) and that identifying an IP subscriber is insufficient to prove the identity of an actor

27

(*Cobbler Nevada, LLC v. Gonzales*, **9th Cir. 2018**). This admission proves WCTC is knowingly proceeding with a disciplinary hearing despite lacking the forensic data (MAC addresses, Device IDs, etc.) required to meet the 'Preponderance' standard of evidence, relying instead on a 'Guest' ticket that contradicts their own security protocols. This failure to preserve or produce exonerating technical data constitutes **Spoliation of Evidence** and a reckless disregard for the Plaintiff's Due Process rights. Plaintiff possesses audio recordings and email correspondence supporting each factual allegation in this Complaint, which will be produced during the discovery phase of this litigation.

## V. CLAIMS FOR RELIEF

### COUNT I: Violation of 14th Amendment (Due Process)

Defendants Pedraza and Skinder deprived Plaintiff of a protected property interest in his education by suspending him without a prior hearing. Defendants further violated Due Process by modifying charging documents *ex post facto* to manufacture a "danger" justification where none existed, and by utilizing an unconstitutional "Preponderance of the Evidence" standard for allegations of a criminal nature.

### COUNT II: Violation of ADA Title II (Retaliation)

Defendants targeted Plaintiff for an "interim" suspension—which has now exceeded 33+ days—specifically because Plaintiff exercised his protected right to file formal complaints regarding his educational environment and disability accommodations. This "interim" action is a pretext for illegal retaliation intended to silence a student whistleblower.

### COUNT III: Deprivation of Civil Rights Under Color of Law (42 U.S.C. § 1983)

28

Defendants, acting under the color of state law as administrators of a public institution, willfully deprived Plaintiff of his clearly established rights under the 14th Amendment. By consciously ignoring Supreme Court precedent (*Goss v. Lopez*) and maintaining a "summary suspension" without evidence of immediate danger, Defendants acted with reckless indifference to Plaintiff's protected property interest in his education.

## COUNT VI: Spoliation of Evidence & Denial of Access to Evidence

Defendants had a mandatory duty to preserve all electronic, digital, and video records once Plaintiff initiated formal complaints in January 2026. By claiming "no records exist" for 7 out of 9 foundational technical logs, and by willfully failing to search the correct calendar year for security footage after being explicitly corrected, Defendants have intentionally or recklessly allowed for the destruction of evidence. Plaintiff moves this Court for an **Adverse Inference**: a formal finding that the destroyed evidence would have proven Plaintiff's innocence and Defendants' bad faith.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants for the following relief:

### Declaratory Relief:

A judgment declaring that Defendants' actions violated Title II of the Americans with Disabilities Act and the Fourteenth Amendment to the U.S. Constitution. A precedent set in which schools are no longer able to use preponderance of the evidence for any allegation against a student that could ever possibly be charged at any level within a court, whether it be civil, criminal or other.

29

**Permanent Injunction and Vacatur of Administrative Guidance:**

Plaintiff requests a permanent injunction and an order of vacatur regarding any and all Department of Education "Dear Colleague" letters or administrative guidance that mandates or suggests a "Preponderance of the Evidence" standard for school disciplinary proceedings involving allegations of a quasi-criminal or common-law nature.

**Declaratory Judgment on the Standard of Proof:**

A judgment declaring that, pursuant to the Seventh Amendment and the Due Process Clause of the Fourteenth Amendment, a public educational institution may not deprive a student of their property interest in education based on a "Preponderance of the Evidence" standard when the underlying allegations—such as "Interference" or "Impersonation"—mirror common law torts or criminal statutes. Such proceedings must require, at minimum, "Clear and Convincing Evidence" or "Beyond a Reasonable Doubt."

**Injunctive Relief:**

An order immediately reinstating Plaintiff to his courses and enjoining Defendants from enforcing 3rd-party contracts that violate FERPA.

**Compensatory Damages:**

Plaintiff seeks compensatory damages in the amount of $27,590,855. This figure is not arbitrary; it represents a specific calculation of the 13 years of cognitive and professional recovery Plaintiff underwent following his Traumatic Brain Injury (TBI)—a recovery period that Defendants have effectively nullified and "reset" through one year of bad-faith administrative "constructive

30

confinement" and the destruction of Plaintiff's educational progress. This amount specifically targets the portion of WCTC's annual budget ($127,590,855) that exceeds a flat $100 million, representing the "surplus" value of a year of life that WCTC has stolen from a disabled student.

**Punitive Damages:**

Plaintiff seeks punitive damages in the amount of $100,000,000. Pursuant to the standards for deterring Constitutional violations by public entities, this amount represents the remainder of WCTC's 2025-2026 annual operating budget. A nominal fine would fail to deter the "ex post facto" modification of legal documents, the "sequestration" of forensic evidence, and the targeted retaliation documented herein. To ensure that the Defendants—specifically the individual administrators who acted with "Deliberate Indifference"—never again view the deprivation of a disabled student's rights as a "cost of doing business," the penalty must be equivalent to the institution's entire annual capacity to function. The amount sought for punitive damages is necessitated by the Defendants' recidivist-like behavior in faking 'emergency' text and sequestering evidence; a lesser amount would be viewed by a $127M-budget institution as a mere 'licensing fee' for violating the Constitution.

A replacement of the positions held by each defendant with an interim employee to be filled by a more permanent solution when one is found.

The understanding that purely school based disciplinary processes may stay within the school, if as state above, they are neither "quasi-criminal or common-law nature" based allegations. If the allegations are simple, school-based actions like "disrupting class", "unexcused absence for X number of classes", or other such purely school related actions, those are fine to be handled purely internally. The moment expulsion or, as is seen here: indefinite suspension is in the discussion we've moved well past simple school proceedings.

31

Such other and further relief as this Court deems just and proper.

E.   JURY DEMAND

I want a jury to hear my case.

☒ – YES          ☐ – NO

I declare under penalty of perjury that the foregoing is true and correct.

Complaint signed this __27th__ day of __March__ 20_26_.

Respectfully Submitted,

_Ryne Schnell_
Signature of Plaintiff

_1-414-755-9049_
Plaintiff's Telephone Number

_rjschnells@gmail.com_
Plaintiff's Email Address

_307 Park Hill Dr. Unit G_

_Pewaukee, WI 53072_
(Mailing Address of Plaintiff)

(If more than one plaintiff, use another piece of paper.)

**REQUEST TO PROCEED IN DISTRICT COURT WITHOUT PREPAYING THE FILING FEE**

☒   I **DO** request that I be allowed to file this complaint without paying the filing fee. I have completed a Request to Proceed in District Court without Prepaying the Filing Fee form and have attached it to the complaint.

☐   I **DO NOT** request that I be allowed to file this complaint without prepaying the filing fee under 28 U.S.C. § 1915, and I have included the full filing fee with this complaint.

Complaint – 5